CRAWLEY, Judge.
In June 1994, Sherral Newsome, individually and as guardian, personal representative, and next friend of Charles Kevin Jones, a minor, filed a complaint against James Earl Case and Mead Corporation. The claim against Mead was based on the theory of respondeat superior. Newsome alleged that Case, acting as an agent for Mead, had negligently and/or wantonly injured Jones in an automobile accident. She requested compensatory and punitive damages from Mead and Case. Mead moved for a summary judgment,' alleging that Case was not an agent of Mead at the time of the accident. The trial court granted Mead’s summary judgment motion and made the summary judgment final pursuant to Rule 54(b), Ala.R.Civ.P. Newsome appealed. The Supreme Court transferred the appeal to this court pursuant to Ala.Code 1975, § 12-2-7. We affirm.
Newsome argues that the trial court-erred in finding that Case was not acting as an agent of Mead at the time of the accident and therefore erred in entering Mead’s summary judgment. Newsome contends that the trip on which Case was traveling at the time of the accident was within the scope of Case’s employment because, she argues, Mead benefited from Case’s leaving the plant to obtain food for other workers who stayed on the job. Kennedy v. Cochran, 475 So.2d 872 (Ala.Civ.App.1985).
A motion for summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala.R.Civ.P. Moreover, our Supreme Court has written:
“In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present ‘substantial evidence’ creating a genuine issue of material fact — ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ”
*583 Capital Alliance Insurance Co. v. Thorough-Clean, Inc., 639 So.2d 1349, 1350 (Ala.1994) (citations omitted).
In order for a plaintiff to recover against a defendant under the doctrine of respondeat superior, the plaintiff must establish two facts: (1) that the status of employer and employee existed at the time of the negligent or wanton act and (2) that the act was done in the scope of the employee’s employment. Wells v. Henderson Land & Lumber Co., 200 Ala. 262, 76 So. 28 (1917). It is undisputed that Case was an employee of Mead at the time of the accident. He was still on the clock and was being paid by Mead while he was on the trip. Therefore, we must determine if Newsome presented substantial evidence that he was acting in the scope of his employment when the accident occurred.
In his deposition, Case testified that at the time of the accident, he was getting lunch for himself and seven or eight of his fellow crew members. He further testified that on the day of the accident he was working what was termed the “utility position.” He described the duties of the “utility position” as follows:
“[A] full crew — an eight or nine man crew, which is full crew. He has no specific duty really other than clean up a specific area that each crew has. He’d give people breaks, let them maybe eat a bite, go get them a Coke, this, that and the other. Feed what we can cola rolls if there are any [sic]. Basically just what he is is utilities [sic]. He’s there for whatever needs to be done.”
He stated that he had his supervisor’s permission to get lunch for himself and the entire crew. He had also picked up food for his supervisor.
Mead contends that it is not within the scope of the employment of its employee to get lunch for a work crew. Mead’s plant manager testified as follows in his affidavit:
“During the afternoon shift, employees normally eat their dinner during the shift and do not have a specific scheduled dinner break. From time to time, employees leave the mill property to obtain meals and then return to the mill. Since the employees are on a straight eight hour shift, they do not clock out when they leave nor clock back in when they return. The majority of the employees bring their meals with them and never leave the plant property. When employees leave the plant for the purpose of obtaining meals during their shift, they are traveling on a personal errand and are on no business for Mead.
“... At about 5:00 P.M., Mr. Case left Mead property in Stevenson driving his own vehicle to obtain a meal for himself and a few others on his crew. His assigned duties do not include making trips of this nature during working hours. At the time he left Mead’s property, he was no longer acting in the course of his assigned duties and employment with Mead. James Earl Case was on a personal errand for himself and a few of his fellow employees to obtain a meal at Bud’s Barbecue in Stevenson, Alabama. The accident in which he was involved occurred while he was away from the plant on that errand. On the errand, he was away not acting in furtherance of any [of] his duties as an employee of Mead and in no manner promoted Mead’s interest. The trip which Mr. Case took at the time of the accident was outside of his duties as an employee of the Mead Corporation.”
Case further testified in his affidavit:
“2. The work schedule at Mead for the Paper Mill is a swing shift and on January 3, 1994, I was working the afternoon shift from 3:00 P.M. to 11:00 P.M. On that day I reported to work between 2:30 and 3:00 to begin the shift at 3:00. During this particular shift, I was working the utility position on our crew. During afternoon shift, we normally eat our evening meal sometime between 5:00 P.M. and 5:30 P.M., but do not get a regular dinner break. Sometimes, we leave our job at the plant to go into town to get dinner. Since I was working utility on this particular shift, I was not tied down to any particular job and offered to go into Stevenson to Bud’s Barbecue and pick up the dinner. I left my job and the Mead Plant at about 5:15 and went through Stevenson toward Bud’s Barbecue driving my own vehicle. I was on this trip away from the plant when *584 the accident occurred with Charles Kevin Jones. When I left the Mead Plant, I was on a personal errand for myself and several of the other employees to get dinner. Making this trip was no part of my assigned duties in the Paper Mill and I was not doing anything for Mead at the time. My actions were purely for the convenience of myself and a few other employees to get the evening meal. Even though I had the permission of my supervisor to make this trip, I know of no benefit which was conferred on Mead by my making this trip.”
In opposition to Mead’s motion for summary judgment, Newsome filed the deposition of Case in support of her theory that Case’s trip was in the scope of his employment; Case testified as follows:
“Q. All right. Is there any company policy in January of 1994 against you or someone driving to Bud’s Barbecue or somewhere else and picking up dinner and bringing it back?
“A. Not that I’m aware of. Because it was fully understandable that we were allowed to go out.
“Q. Did your supervisor, Mr. — did Ra-bón Sanders and David Starling, were they aware that this was something that you all did?
“A. Yes, sir.
“Q. How often would someone go out and get something and bring it back?
“A. That’s really hard to say. On the paper machine we don’t get a lot of time, break time. And if we’re running real good and we got a full crew, then it’s usually standard we go order out. If we were running good. There were times when we run real bad and we don’t— sometimes we don’t even get to eat.
“Q. Do you all have any set times where you take breaks for meals?
“A. No.
“Q. Is it understood, though, that if possible you’re going to get a break for a meal?
“A. Would you repeat that?
“Q. You said there’s sometimes when you don’t eat, no one on the crew eats?
“A. Sometimes you might grab a candy-bar right quick and maybe douse a Coke down. Sometimes you have those days.
“Q. How often did those happen?
“A. You might have two a shift — two a week. You might have three a week. You might not have any a week. I can’t put a number on it.
“Q. How would you decide who was going to go out and get the dinner and bring it back?
“A. It was a normal practice for the utility because he was actually free after the dry end assistant got through cutting cores. . Now, if he did not want to go, somebody else would go.
“Q. You all just amongst yourselves decided who was going to do?
“A. Yeah.
“Q. Somebody would say I’ll run and get it today?
“A. Well, no.
“MR. LEWIS: Objection.
“A. It was the norm that the utility went.”
This deposition testimony offered by New-some does not constitute substantial evidence in opposition to Case’s affidavit testimony nor the affidavit testimony of the plant manager that the trip was not within the scope of Case’s employment. We conclude that there was no issue of material fact as to whether Case was acting within the scope of his employment in obtaining lunch for his fellow work crew members. Therefore, we affirm the judgment of the trial court.
AFFIRMED.
THIGPEN and YATES, JJ., concur.
ROBERTSON, P.J., and MONROE, J., dissent.